ALFRED STEWART, ADMINISTRATOR, ETC., v. HERMAN E. CURTIS AND LOTTIE L. CURTIS.

*Deed—Insanity—Fraud.*

The bill in this case was filed to set aside a deed alleged to have been secured by the grantee when the grantor was wholly incompetent to execute it by reason of insanity. And upon a review of the testimony it is held that the property in question belonged to the grantor, and that it was entirely right and proper for her so to dispose of it as to secure to herself support and care during the remainder of her life, which she did deliberately, and while in the full possession of her faculties.

Appeal from Macomb. (Canfield, J.) Argued April 10, 1891. Decided May 8, 1891.

Bill to set aside a deed. Complainant appeals. Decree dismissing bill affirmed. The facts are stated in the opinion.

*Eldredge & Spier,* for complainant, contended:

1. This Court has granted relief against deeds executed by a person mentally incompetent in many cases; citing *Jacox v. Jacox,* 40 Mich. 473; *Thorn v. Thorn,* 51 Id. 167; *Raynett v. Baluss,* 54 Id. 469; *Leonardson v. Hulin,* 64 Id. 1; *Churchill v. Scott,* 65 Id. 485.

2. Marietta Curtis took no intelligent part in the transaction. The matter was not talked over by her with any person. The scrivener of defendant came to the house of defendant's father, and drew the papers as defendant had directed him. She in no way exercised any will in directing the act done. From defendants' witnesses' statements of the transaction, when due allowances are made for the effect of leading questions and interests, the Court must say of this transaction, as it did in *McDaniel v. McCoy,* 68 Mich. 340, "No person supposed to be of sound mind would have been made such a mere puppet in dealing with her interests."

3. When a party deals with a man (much more with a woman) whom he knows to be of weak mind or intellect, and the good faith of such dealings is challenged, he has the burden of proof to show that no undue advantage was taken; citing *Gates v. Cornett,* 72 Mich. 434, 435; *Crawford v. Hoeft,* 58 Id. 10.

4. It is not necessary under the circumstances of this case that the case should be one of fraud, or even of undue influence. It is enough if defendant dealt oppressively with his aunt, or that the consideration for the deed was either wanting or inadequate; citing *Bowe v. Bowe,* 42 Mich. 195; and that which has the effect of fraud on people who are practically helpless is subject to the same consequences as if it were deliberate and actual fraud. Courts of equity cannot allow such dealings to stand; citing *Crips v. Towsley,* 73 Mich. 400; *Nolan v. Nolan,* 78 Id. 17.

5. This Court set aside a deed on the ground of failure of consideration in *Shepardson v. Stevens,* 77 Mich. 256; and see *Patterson v. Patterson,* 47 N. W. Rep. 768 (Iowa).

*F. P. Monfort* (*T. M. Crocker,* of counsel), for defendants, cited no authorities.

GRANT, J. Edwin M. Curtis, as the guardian of Marietta Curtis, an insane person, filed the bill in this cause to set aside a deed made by said Marietta Curtis to

defendant Herman E. Curtis. Upon her death Alfred Stewart was appointed administrator, and was allowed by order of the court to appear and prosecute the suit. The grounds alleged for setting aside the deed are that she was wholly incompetent to execute it by reason of insanity, and that while so incompetent the defendant Herman induced her to execute the deed by false and fraudulent representations.

The deed was made August 18, 1887. The bill was filed January 30, 1888. Marietta died February 10, 1888. Decree was entered dismissing the bill after a hearing upon pleadings and proofs.

The land involved comprises about 50 acres, and was at the time worth about $1,500. There was a house upon it, in which Marietta and her mother had lived for many years prior to her mother's death, which occurred in March, 1887. She was never married, and evidently was a lady of unusually modest and retiring disposition. Upon her mainly had fallen the care and support of her aged mother. She had several brothers and sisters, of whom one, James Curtis, lived near by, and with whom Marietta and her mother lived during the winter previous to the mother's death, during which time the defendants occupied Marietta's house. Upon the death of her mother she went to visit her brothers and sisters in Shiawassee county. After a visit of some two months she returned to the house of her brother James, and soon went to keeping house in her old home. Her relatives invited her to live with them, but she declined, preferring to live in her old home; being evidently attached thereto by her residence of many years. James Curtis and his wife assisted her in fixing up the house, where she lived for a while alone. She was then 65 years of age, and her health had not been very good. There is no claim on the part

of the complainant of any mental derangement until after her mother's death, and while she was visiting her relatives.

Upon the delivery of this deed the defendants executed a life-lease of the premises to Marietta, in which they covenanted to furnish her a home and support her during her life. The relations between Herman and his aunt had always been friendly. At the time of the execution of these papers he was carrying on a farm of 120 acres. He gave that up as soon as practicable, and took charge of the premises in question. She took two rooms, which were those of her choice, which she continued to occupy until she was taken away by her brother Edwin M. Curtis. The death of Marietta has sealed the mouth of Herman as to all that took place between him and her. The record is utterly barren of any evidence tending to show any false or fraudulent representations made by Herman as an inducement to the making of the deed.

The evidence fails to show that the defendants were guilty of cruel treatment towards her, or that they failed to comply with their agreement. She lived and ate at the same table with them. After her mind had become deranged, and James Curtis had written to his brother and sisters on December 7 that she was worse, her brother and sister came to Herman's house, and all the evidence of any cruel treatment comes from them. On the contrary, James Curtis and his wife, who lived close by, Mr. and Mrs. Scott, two near neighbors, and the defendant Lottie L. Curtis, give testimony to the contrary, which we think entirely breaks the force of the testimony of this brother and sister, who are intensely interested and prejudiced. So intense was Edwin's feeling that he stated that he would make it cost Herman all the land was worth before he got done with him.

The only question, therefore, left to determine is whether Marietta was competent to make the deed.

The scrivener who drew the papers was one Bert C. Preston, whom Herman went after and brought to the house. He testifies that on his arrival he told Marietta that Herman had brought him to draw some papers for her, to which she replied, "Yes." He then said: "Herman says you want me to draw a deed from you to him of your farm, and take a life-lease back. Is that correct?" She replied that that was what she wanted. There were present at this time Herman, his wife, and mother, Mrs. James Curtis. After the papers were drawn, Mr. Preston says he read them over carefully to them all, in the presence of them all. He then asked Marietta if she understood their full meaning, and if they were drawn just as she wanted them. She answered that she understood them, and that they were drawn just as she wanted them. The papers were then both executed. He further testified that she appeared the same as other women, only a little more silent, timid, and retiring than most women. On cross-examination, this witness testified that Herman told him, on their way to the house, that Marietta was naturally a timid woman, and that when he came into her presence he hoped he would be plain and simple in his manners, because if he made unnecessary show, or ostentatious appearance, it might confuse her; that she was inclined to be nervous at times; that she was feeling first rate that day, and on that account he expected they would do the business without any difficulty with her, without frightening her, or something like that. "He might have said 'fretting.' I can't remember the word he used, but that was the impression I got." He further said he was very particular to find out that she understood the full purport of the papers.

Previous to making the arrangement she talked with her brother James and his wife, and with her neighbor Mr. Scott, in regard to the arrangement. After it was made she talked with them and with others about it. Soon after it was made she went again to visit her brother and sisters in Shiawassee county, and told them what she had done, and asked their opinion about it. The testimony on the part of the complainant is directed to the time of her two visits to her relatives, and to December, 1887, and January, 1888, when it is admitted she had become insane. We cannot be blind to the fact that this testimony comes largely from interested and prejudiced witnesses. They produce no testimony as to her condition at the time the papers were executed, nor for some time prior or subsequent thereto. She knew Herman and his wife. She was under as much obligation to them as to her brothers and sisters, except her brother James, who had rendered her some assistance, and to whom she said she thought perhaps she ought to have given something for what he had done for her. It was entirely natural that she should desire to live in her old home, and that she should make arrangements with some one to live there with and take care of her. There was nothing unnatural or improvident in the arrangement she made. She was in fact under no obligations to any of her brothers and sisters who are now making this contest. The property was hers, and it was entirely right and proper for her so to dispose of it as to secure to herself support and care during the remainder of her life. We think she did this deliberately; and while in the full possession of her faculties.

The decree is affirmed, with costs.

The other Justices concurred.